IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Fredrick Tillmon, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 CV 50068 |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| Director Stovall, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

The County defendants' motion for summary judgment [100] is granted, and defendants York and Elazegui's motion for summary judgment [97] is granted. Judgment in granted in favor of these defendants on all counts. This case is closed.

**STATEMENT**

This § 1983 lawsuit was originally filed *pro se* by plaintiff Fredrick Tillmon, but after screening the complaint, this court recruited counsel to represent him. Counsel filed a first amended complaint and later a second amended complaint [65], which is now the operative complaint. This lawsuit concerns a period of a little over six weeks when plaintiff was a pre-trial detainee at the Stephenson County Jail ("SCJ"). Specifically, on May 7, 2018, he was transferred to SCJ from the Cook County Jail where he had been housed the previous seven days. Then, on June 21, 2018, he was transferred to Dixon Correctional Center ("Dixon"). Plaintiff's central allegation is that, soon after arriving at SCJ, he asked to be given certain medications that he told prison officials he had a prescription for and that he had been taking during his seven-day stay at the Cook County Jail, and perhaps taking before then as well. The main medication at issue was Depakote, which is used to treat seizures and is also sometimes prescribed as a mood stabilizer. Eventually, on June 19th, plaintiff was seen by defendant Dr. Elazegui who, after examining him and taking his medical history, prescribed Depakote for plaintiff. Two days later, plaintiff was transferred to Dixon, thus ending his interaction with the defendants in this lawsuit. (Plaintiff is apparently no longer incarcerated.) Plaintiff alleges that the delay in getting Depakote caused ill effects, including night-time hallucinations and stomach pain. Aside from his delayed-medication claim, plaintiff makes a few other allegations, but they are more peripheral.

The second amended complaint names eight individuals as defendants. (As will be discussed below, it does *not* name any institutional defendants). The defendants fall into two groups—the medical and non-medical defendants. The first group is Nurse Diane York and Dr. Rozel Elazegui, who were both employed by an outside provider and who were both involved to varying degrees in providing medical care to plaintiff. These two defendants will be referred to as the York defendants. They have filed a motion for summary judgment. The remaining six defendants are individuals who were working at SCJ during this six-week period. These defendants are Steve Stovall, director of SCJ; Tina Diddens, deputy; Jim Herendeen, deputy; Rob Klosa, deputy; Shawn Stouffer, deputy; and Shannon Lameyer, deputy. All the claims against these defendants are asserted against them only in their individual capacities. They will be referred to as the County defendants, and they also have filed a separate summary judgment motion. Both sets of defendants have filed, in addition to their summary judgment motion, a supporting memorandum of law and a Rule 56.1(a)(2) statement of material facts, with attached exhibits.

Plaintiff responded to these multiple filings by filing a combined response brief, which attached three exhibits. However, plaintiff did not file any objections to the defendants' two Rule 56.1 statements, nor did plaintiff file his own statement of additional material facts under Local Rule 56.1(b)(3). By failing to respond specifically to the defendants' Rule 56.1 statements, plaintiff has not complied with this local rule. As a result, this court will deem admitted all the facts set forth in these two Rule 56.1 statements. *See Martin v. Gonzalez*, 526 Fed. Appx. 681, 682 (7th Cir. 2013) ("The court accepted the officers' facts as admitted because he did not follow the court's Local Rule 56.1(b)(3)(B), which instructs the party opposing summary judgment to respond to each numbered paragraph in the moving party's statement of facts. District courts have broad discretion to enforce local rules governing summary judgment, including specifically Rule 56.1(b)(3)(B)."). Also, in plaintiff's response brief, he makes some factual assertions drawn from the three exhibits he attached to his brief. This is also not in compliance with Local Rule 56.1, which requires that these additional facts be set forth in a separate statement of additional facts. As courts have noted, litigants who fail to comply with Local Rule 56.1 face an uphill climb in opposing a motion for summary judgment. *See, e.g., Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("the penalty for failing to properly respond to a movant's 56.1(a) statement is usually summary judgment for the movant (at least if the movant has done his or her job correctly) because the movant's factual allegations are deemed admitted").

The legal framework for the present motions was set forth in the court's screening order. [6 at p.3.] To re-summarize, an inadequate medical care claim brought by a pretrial detainee under the Fourteenth Amendment is subject to an objective unreasonableness standard. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). To state such a claim, plaintiff must allege facts indicating he faced a serious medical condition, and jail officials made purposeful, knowing, or possibly reckless (as opposed to negligent) decisions to respond to that risk in a manner that was objectively unreasonable under the circumstances. *Id.*

The court will begin with the County defendants' motion, which can be addressed in relatively short order. As noted above, plaintiff's main allegation is about the alleged delay in getting him Depakote. However, this allegation is only tangentially related to the County defendants who were not in charge of plaintiff's medical care. Plaintiff alleges that a few of the County defendants were told about plaintiff's medical concerns. Yet, as the County defendants convincingly argue in their opening brief, the undisputed facts show that these defendants knew that plaintiff was in contact, through the medical kiosk and otherwise, with nurse York and other medical providers. Therefore, it was not the County defendants' responsibility to address plaintiff's medical needs other than, hypothetically say, to call 911 if there were a medical emergency. Plaintiff has alleged that defendant Stovall was aware of plaintiff's grievances, but there is no evidence that he was. Separately, plaintiff has alleged that some of the County defendants acted improperly relating to an incident on June 8, 2018—*i.e.* in the middle of the six-week period. On this date, plaintiff asked defendant Herendeen if plaintiff could be housed in medical or G block. Plaintiff showed Herendeen a printout of kiosk requests that plaintiff made to medical. But after discussing the issue with defendant Klosa, Herendeen concluded that plaintiff did not need to be moved to the medical block and was instead moved to G block. The next day, another officer, who is not a defendant, talked to plaintiff about the move to G block and, during this conversation, plaintiff cursed at him and threw a bottle containing Clorox at him, which splashed into the officer's eyes and mouth. After a hearing, plaintiff was given 30 days in administrative segregation for his role in this incident. In their opening brief, the County defendants thoroughly addressed all these allegations against them, cited to the undisputed facts and relevant case law, and then argued that they did nothing wrong.

In plaintiff's response, he did not address these specific arguments, other than by making a few vague general references to the allegations against the County defendants. For example, at pp. 8-9 of his brief, plaintiff notes briefly that defendant Stouffer's determination that plaintiff did not need to be

transferred to medical care might have been a form of punishment. But plaintiff does not rebut the County defendants' particular argument that they were relying on the medical defendants to address plaintiff's medical needs and were relying specifically on the fact that the medical defendants had not indicated that plaintiff should be moved to the medical block. Moreover, plaintiff was in fact moved to G block, which was one of the places he specifically requested to be moved to. In sum, by failing to provide any meaningful substantive response to the arguments and case law raised in the County defendants' opening brief, plaintiff has forfeited any arguments in opposition to the grant of summary judgment in favor of these individual defendants. *See Klein v. Town of Schererville*, 2023 WL 119633, *3 (7th Cir. Jan. 6, 2023) (finding that a one sentence argument was an undeveloped argument and was therefore waived).

The court next considers the motion filed by the York defendants (York and Elazegui). Like the County defendants, their opening brief sets forth convincing arguments based on undisputed facts and controlling Seventh Circuit case law. The court will first summarize these arguments before considering how plaintiff responded to them.

Everyone agrees that Dr. Elazegui had a very limited role. He saw plaintiff one time, on June 19th, and prescribed Depakote for plaintiff at this visit. In short, he provided the basic relief plaintiff was seeking. But plaintiff has a few complaints still. He alleges that, even though Dr. Elazegui prescribed Depakote, the initial dose was not as high as plaintiff wanted. Dr. Elazegui prescribed 250 mg three times a day but plaintiff wanted 500 mg each time. But Dr. Elazegui argues that his initial dosage decision was a valid medical choice. This court agrees. As Dr. Elazegui explained, his practice was to start with a lower threshold dose of a medication to see if it provided any therapeutic effect before increasing that dose. This approach was based on a concern for possible side effects; if there were none, then the dose could always be increased later. This cautionary approach is well-recognized. *See, e.g.*, *Griffith v. Wexford of Indiana*, 2021 WL 7543593, * 6 (S.D. Ind. Mar. 30, 2021) (prison doctor, who was prescribing psychiatric medication, "ordered the dosage titrated to attempt to assess its effectiveness"); *Wesley by Wesley v. Armor Correctional Health Services Inc.*, 2022 WL 16748861, *2 (E.D. Wisc. Nov. 7, 2022) ("As it relates to psychotropic medication, titration refers to the process by which a patient's dosage is started at a sub-therapeutic level and gradually increased over time to limit exposure to serious side effects."). Based on the undisputed facts in the record, there is no evidence from which a reasonable jury could conclude that Dr. Elazegui was not exercising his medical judgment in a good faith attempt to treat plaintiff. *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (a medical professional is "entitled to deference in treatment decisions unless 'no minimally competent medical professional would have so responded under those circumstances'"). As for the six-week delay, plaintiff has not shown that Dr. Elazegui was responsible for this delay. He visited the facility once every two weeks and, unfortunately in this case, had to miss two scheduled visits in a row due to family emergencies, which resulted in a gap before plaintiff saw him. However, no evidence has been introduced indicating that Dr. Elazegui was the person who set the schedule for the frequency of his visits or that he was somehow tasked with finding a substitute when couldn't come because of extenuating circumstances.

In plaintiff's response brief, he again does not address these specific arguments. He did not argue, as he did in his original *pro se* complaint, that Dr. Elazegui was deliberately indifferent by starting with an initial dosage of 250 mg instead of 500 mg. By not challenging these arguments, plaintiff has conceded that he has no valid claims against Dr. Elazegui. And based on the opening-brief arguments, this court does not believe that any reasonable jury could find that Dr. Elazegui did anything wrong.

The court next considers the allegations against nurse York. She was working as a registered nurse at SCJ, a job she had held for many years. Of the eight defendants, she had the most interaction with plaintiff. This is because one part of her job was to respond to inmate medical requests made through a kiosk system. Plaintiff used the kiosk system frequently to make requests and submit grievances. And York

3

responded to most of these requests, usually within a day, sometimes several days later depending on the type of request.

Plaintiff's theory is that York knew about plaintiff's medical health problems from his previous stays at SCJ and specifically knew that he had sometimes been given Depakote. In his words, he was a "familiar individual." Knowing his history, the SCJ staff should have given him Depakote when he arrived this particular time and asked for this medication. It is undisputed that plaintiff told intake officials that he had a history of depression, seizures, bipolar disorder, and schizophrenia and that he had been taking Depakote and Remeron for these conditions and that he asked to be given these medications. Plaintiff made this same request, in one way or another, many times over the ensuing several weeks. The core allegation is simple—it took too long to get him the Depakote. However, this allegation is framed in an abstract way, untethered to a particular defendant. The precise question now under consideration is specifically whether nurse York, individually, can be blamed for this alleged failure. It is a bedrock principle in § 1983 litigation that "[a] government official is liable *only if* [*they*] *personally* caused or participated in a constitutional deprivation." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022) (emphasis added).

Plaintiff first claims that York should have given him Depakote because he had allegedly been given this medication at an earlier SCJ stay. But this argument fails for the simple reason that York had no authority to dispense this medication on her own. She was not a doctor, and her employer did not allow her to give out this medication without a prescription. And it is undisputed that plaintiff did not himself have a prescription when he came to SCJ. York testified that she could not just take his word that he had a prescription from the Cook County Jail.[1] She also asserts that she could not rely on plaintiff's self-reported claim that he had been given Depakote during previous stays at SCJ. In fact, at one point, when plaintiff raised this argument with York, she checked the SCJ medical records on file for plaintiff, and these records indicated that, at least going back to early 2011, that he had *not* been on *any* prescription medications while at SCJ. These facts are undisputed.

So a prescription was needed. SCJ officials decided that the quickest way to get one was to ask for plaintiff's medical records from the Cook County Jail where he had just stayed. (As it turned out, this was not the quickest way.) The effort to get these records was led by a counselor named Jill Cummins (who is not named as a defendant in this case). She met with plaintiff several days after he arrived at SCJ, and helped him execute a release for his records. On May 10th, this release was faxed to the Cook County Jail along with a request for plaintiff's medical records. A week later, after no response had been received, Cummins re-sent the request. York and Cummins repeatedly explained to plaintiff that they were trying to get the records from the Cook County Jail. But for reasons that are still unclear now, the records were apparently never sent by the Cook County Jail.

The other route officials pursued was to have plaintiff evaluated by a doctor who could directly prescribe this medication after examining plaintiff. But this route also ran into obstacles. It appears that plaintiff did not specifically request to see a doctor initially, and perhaps everyone was hoping that the Cook County Jail records would be sent over. But even after a decision was made to have plaintiff seen by a doctor, there were scheduling difficulties caused, first of all, by the fact that visits took place only once every two weeks and then, on top of that, Dr. Elazegui had a family emergency (and then a family death) causing him to miss the scheduled visit two times in a row.

It is unfortunate that neither of these routes led to a timelier resolution. But the record lacks sufficient evidence that would allow a reasonable jury to conclude that York was personally at fault for this delay. There's no evidence that she had any power over the Cook County Jail to make them respond quicker.

---

[1] In their reply brief, the York defendants raise doubts as to whether plaintiff even had a prescription: "Indeed, despite months of discovery, Plaintiff's purported prescription from the Cook County Jail has never surfaced." [109 at p. 9.]

4

And it appears that Cummins was the point person handling this request in any event. Plaintiff has not suggested that York had any power to change the frequency of doctor visits or to somehow get a substitute when a doctor couldn't make it due to a family emergency. Throughout this period of waiting, York repeatedly responded to plaintiff's many requests and grievances and kept him informed of the progress of the efforts to get his records from the Cook County Jail and also to get him an appointment with the doctor.[2] York also asked plaintiff during this period how he was doing, specifically asking whether he had any suicidal thoughts. He apparently never affirmatively stated that he did. In addition, plaintiff met at least several times with Cummins, who is an LCPC (licensed clinical professional counselor). York testified that she believed it was reasonable to schedule plaintiff to first see Cummins before seeing Dr. Elazegui because Cummins could provide counseling for plaintiff's mental health issues. Cummins noted that plaintiff was calm and cooperative and not experiencing hallucinations. [101 at p. 5.] Again, all these facts are undisputed. In this court's view, after considering these undisputed facts, no reasonable jury could find that York acted in an intentional or reckless manner.

This conclusion is also supported by the fact plaintiff in his response brief did not offer any meaningful rebuttal to these specific arguments about York's particular role.[3] As a result, plaintiff has effectively abandoned his claims against her. At this point, one might reasonably be wondering what plaintiff does argue in the response brief. The answer is that he introduces a new theory of recovery. Rather than focusing on individual wrongdoing, plaintiff shifts to a more global perspective and criticizes the broader "policies and procedures put in place for medical care of pre-trial detainees" at SCJ. [107 at p. 1.] He attaches an agreement made between Stephenson County (and others) and the Correctional Healthcare Companies, Inc. ("CHC"), who he alleges is the employer of York and Dr. Elazegui. [107, Ex. A.] This agreement contains provisions pertaining to the administration of psychotropic medications. *Id.* at p. 4. This agreement also requires compliance with standards set forth in the National Commission on Correctional Health Care ("NCCHC"). Relying on these standards, plaintiff argues that York was "not certified by [NCCHC] to provide mental health care" and that the SCJ "does not comply with standards for psychiatric medications." *Id.* at p. 7. Plaintiff argues specifically that the NCCHC standards require that an inmate should be scheduled to see a qualified psychiatric provider "as soon as possible" for an evaluation and that SCJ should have had a mental health professional "available and present for specific hours during the week." *Id.* at 8-9.

Even assuming that these policy-based claims have some merit to them, they are unavailing now at this stage of the litigation. First, plaintiff has not named any institutional defendant, nor pled any *Monell* claims. The second amended complaint does not name, for example, Stephenson County or any other municipal entity as a defendant. York and Dr. Elazegui are only named in their individual capacities, and as noted already, plaintiff has not pointed to evidence showing that they created or implemented any of

---

[2] A few examples can be given to illustrate how York typically responded. On May 17th, she explained to plaintiff that, because he did bring any medications with him to SCJ, she could not dispense medications based on his self-reports. She also told him that SCJ staff had faxed the release for plaintiff's records to the Cook County Jail. On May 24th, she again told plaintiff that SCJ officials were trying to get his Cook County Jail records to verify his self-reported prescriptions. She added that she had no control over when the Cook County Jail would release his mental health records, and she told him that she had reviewed his earlier SCJ medical records and had not seen any evidence that he had medications prescribed during his previous incarcerations. She also noted that she had not yet received a request from him about seeing a medical doctor. She finally asked him if he was having any suicidal thoughts or ideations but did not receive a response.

[3] Plaintiff only makes a few passing references to York. For example, he recounted some of his earlier stays at SCJ (mostly in the 2009 timeframe) when York was working there. Even so, plaintiff did not go on to rebut York's argument that, notwithstanding this history, she still could not dispense medications without a prescription based on a recollection of a long-ago diagnosis by an unnamed doctor. Plaintiff also vaguely referred to York's failure to "timely follow up" regarding medications, but plaintiff did not develop this argument nor support it with references to the record or to the case law.

5

these policies about staffing or other related matters. Second, these allegations were raised for the first time in plaintiff's summary judgment response brief. This is too late. *See Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) ("a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment") (quoting earlier case). As a result, this court may not consider these arguments now, no matter how appealing they may sound. For all these reasons, both motions for summary judgment are granted. This case is closed.

Date: 1/24/2023                                     ENTER:

                                                                                           *Philip G. Reinhard*
                                                                                    United States District Court Judge

                                                                                                  Electronic Notices.